**CAPITOL INDEMNITY CORPORATION,**
Appellant,

v.

**CITIZENS NATIONAL BANK OF FORT SCOTT, N.A.,**
Respondent.

**No. WD 56564.**

Missouri Court of Appeals, Western District.

Jan. 11, 2000.

Gary V. Fulghum, Kansas City, for appellant.

Stephen M. Ryan, Kansas City, for respondent.

Before: HOWARD, P.J., and ULRICH and SMART, JJ.

VICTOR C. HOWARD, Presiding Judge.

Capitol Indemnity Corporation appeals the circuit court's decision to grant a motion to dismiss for lack of personal jurisdiction in favor of Citizens National Bank of Fort Scott, N.A., a Kansas corporation. Capitol Indemnity had filed a petition against Citizens National alleging that the bank had converted or was otherwise unjustly enriched by the retention of progress payments from a Kansas City, Missouri, construction project for which Capitol Indemnity was obligated to advance funds as a surety. Capitol Indemnity contends that the circuit court erred because the jurisdiction of Missouri courts was established under the long arm statute both by Citizens National committing the tortious act of conversion and by its transacting business in the state of Missouri. We affirm.

On December 26, 1995, Engineered Systems, Inc., (ESI), a Kansas corporation, contracted with the city of Kansas City, Missouri, (the city), to construct road and bridge improvements on Wornall Road. Capitol Indemnity issued a performance bond and a payment bond on May 10, 1996, acting as surety for completion of the project.

On August 2, 1996, Citizens National made a loan to ESI.[1] Accounts, equipment and inventory secured the loan. Under the terms of the note's associated security agreement, ESI agreed to the establishment of a special bank account, known as the "Collateral Account," for the receipt of payments on account. The security agreement denoted: "Upon written request of [Citizens National], [ESI] shall immediately and thereafter deposit all checks, drafts, cash and other remittances (Funds) in payment of the Accounts portion and the Inventory portion of the Collateral in a special bank account (Collateral Account) maintained with [Citizens National] as such Funds are received by [ESI]." No condition of default was required for the bank to exercise this right under the agreement.

The maturity date on the loan was August 2, 1997, however, that was apparently extended until November 2, 1997.[2] In negotiating repayment of the loan, ESI's president told an officer of Citizens Na-

---

1. The loan was in the amount of $500,000. The loan documents show that part of the loan proceeds renewed an existing loan dated March 9, 1995, in the amount of $200,000 and the remainder created a line of credit.

2. The record on appeal does not contain a copy of any formal extension of the note's due date.

tional that she had written to the city on November 21, 1997, requesting that any further payments be sent to ESI in care of the bank's address.[3] On November 25, 1997, Citizens National wrote a letter to ESI requesting, in accordance with the terms of the security agreement, that "all existing and future checks, drafts, cash and other remittances (Funds) arising from payment of any Accounts for [ESI] be directed to this Bank for deposit to a special bank account," and that all withdrawals from the account by ESI were to be made by written request. The letter also referenced the bank's right under the security agreement to notify ESI's debtors of the bank's security interest, and said that "we faxed the city a copy of *your* letter directing Kansas City's payments on the Wornall job to the Bank's address." (Emphasis added.)

On or about January 7, 1998, the city sent a payment in the amount of $15,895.35 made payable to ESI in care of Citizens National at the bank's address in Lenexa, Kansas.[4] On February 4, 1998, the city sent another payment in the amount of $53,008.05 made payable to ESI in care of Citizens National.

On February 9, 1998, Capitol Indemnity sent a letter to the city, which said:

> Capitol Indemnity Corporation, as surety on [the Wornall Road Improvement project] bond, has recently been required to make payment to subs and suppliers on [this] project. To ensure that future contract funds are appropriately applied to obligations on this project alone, I ask that no further disbursements be made solely to Engineered Systems, Inc.

For reasons unknown to me, Engineered Systems has found itself unable to make timely payment to vendors which are involved in this project. As a result, Capitol Indemnity has been notified by these vendors of various nonpayment issues. Thus far, we have made $36,058.27 in payments to vendors on this project.

A representative from Engineered Systems has assured us that the contract balance will be sufficient to pay the financial obligations which remain. Regardless, I would like to request that Capitol Indemnity Corporation be listed as joint payee on any remaining disbursements made to Engineered Systems. Please make all future drafts payable to "Engineered Systems, Inc. and its surety, Capitol Indemnity Corporation."

On April 2, 1998, Capitol Indemnity sent a letter demanding that Citizens National "tender back" the two progress payments made by the city to ESI on January 7 and February 4, 1998. Citizens National refused.

On May 22, 1998, Capitol Indemnity filed a petition in Jackson County, Missouri, alleging in Count I that it was entitled under the doctrine of equitable subrogation to possession of certain progress payments made by the city and that Citizens National "unlawfully acquired ESI's Progress Payments, took possession of the Progress Payments, and unlawfully converted the Progress Payments to its own use." In Count II of the petition, Capitol Indemnity alleged that Citizens National was "unjustly enriched by its wrongful seizure and continued possession of the Progress Payments."

---

3. The letter was written by the president of ESI, on ESI's letterhead stationery, to the city of Kansas City, Missouri. The letter said, "We [ESI] respectfully request that our address be changed from PO Box 564, Booner [sic] Springs, Kansas to C/O Citizens National Bank, 7900 Quivira Road, Lenexa, Kansas 66215."

4. The record does not contain a copy of this draft payment, however, an assistant vice president of Citizens National said in an affidavit that "[t]he City also sent a payment of $15,895.35 to ESI at [Citizens National's] Lenexa address on or about January 7, 1998," but that "[Citizens National] has been unable to locate a copy of the January 7, 1998 treasury warrant issued by the City to ESI."

In response, Citizens National filed a motion to dismiss for lack of personal jurisdiction. It argued that it had not performed any act within the state of Missouri to bring it under the long arm jurisdictional statute, nor did it have sufficient minimum contacts with Missouri in consideration of due process concerns that justify it being haled into court in Missouri.

Specifically, Citizens National stated in its motion, that it was a national bank doing business in Kansas, but that it does not maintain an office in Missouri. It also said that it does not have a certificate of authority to do business in Missouri, does not maintain a registered agent for service of process in Missouri, and owns no property in Missouri. Citizens National further stated that it has never transacted any business with Capitol Indemnity, and has no relationship, contractual or otherwise, with it. It also said that ESI is a Kansas corporation, and that its loan agreements were signed in Kansas, that the loan was not made in connection with the Wornall construction contract, and that any payments on the loan were received in Kansas.

With regard to the faxed letter, in an affidavit accompanying the motion to dismiss, an assistant vice president of Citizens National said:

> In connection with [Citizens National's] request that ESI pay over its accounts receivable, ... ESI's president, told me that she had written to the City of Kansas City, Missouri (the "City") directing that the City's future payments to ESI be sent to ESI at the Bank's branch office in Lenexa, Kansas.

> [ESI's president] sent [Citizens National] a copy of the letter that she said she had sent to the City.... I faxed a copy [of that letter] to the City to ensure that the letter was received. Apart from this telefax, I never called or wrote anyone at the City requesting the City to make payment to the Bank for or on behalf of ESI.

This affidavit further stated that the city of Kansas City did not make any payments to Citizens National of money owed to ESI under the contract, and that no one from Citizens National ever met with any officials from the city or "called, wrote or made demand on the City that the Bank be paid progress payments due to ESI."

The circuit court granted the motion to dismiss without discussion. Capitol Indemnity appeals.

The Missouri Supreme Court has delineated the standard of review of a dismissal for lack of jurisdiction:

> When a motion to dismiss for lack of personal jurisdiction is made on a matter not appearing on the record, the trial court may hear it on affidavits presented by the parties, or the court may direct that the matter be heard wholly or partly on oral testimony or deposition. When affidavits are presented, the trial court may believe or disbelieve any statements made within those affidavits. It is within the sole discretion of the trial court to make such factual determinations. [The appellate court] must affirm the trial court's ruling regarding jurisdiction if the affidavits submitted by the defendants in support of their motions to dismiss show they did not commit any act sufficient to invoke the jurisdictional provisions of the Missouri [l]ong [a]rm [s]tatute. (Citations omitted.)

*Chromalloy American Corporation v. Elyria Foundry Company*, 955 S.W.2d 1, 4 (Mo. banc 1997) (quoting *Quelle Quiche v. Roland Glass Foods*, 926 S.W.2d 211, 213 (Mo.App.1996)). This standard of review does not convert the motion to dismiss into a motion for summary judgment as "the trial court's inquiry is limited to an examination of the petition on its face and the supporting affidavits to determine the limited question of personal jurisdiction." *Chromalloy*, 955 S.W.2d at 3, n. 3. The merits of the underlying action are not considered. *Id.*

When the defendant raises the issue of personal jurisdiction in a motion to dismiss, the plaintiff has the burden to show that the circuit court's exercise of jurisdiction is proper. *Shirkey v. McMaster*, 876 S.W.2d 648, 649–50 (Mo.App.1994). To subject a non-resident defendant to the long arm jurisdiction of this state, the plaintiff must plead and prove two elements: first, that the suit arose from any of the activities enumerated in the long arm statute, § 506.500, RSMo 1994; and second, that defendant has sufficient minimum contacts with Missouri to satisfy due process requirements. *Chromalloy*, 955 S.W.2d at 4. *See also State ex rel. William Ranni Associates, Inc. v. Hartenbach*, 742 S.W.2d 134, 137 (Mo. banc 1987).

Section 506.500, RSMo 1994, says:

1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this state;

(2) The making of any contract within this state;

(3) The commission of a tortious act within this state;

(4) The ownership, use, or possession of any real estate situated in this state;

(5) The contracting to insure any person, property or risk located within this state at the time of contracting;

(6) Engaging in an act of sexual intercourse within this state with the mother of a child on or near the probable period of conception of that child.

"A party relying on a defendant's commission of a tort within this state to invoke long arm jurisdiction must make a prima facie showing of the validity of his claim." *State ex rel. William Ranni*, 742 S.W.2d at 139.

In its first point, Capitol Indemnity contends that the Missouri long arm statute conferred jurisdiction over Citizens National because the bank committed a tortious act in Missouri. It alleges that this occurred when Citizens National converted the progress payments made by the city to ESI to its own use and failed to tender those payments back to Capitol Indemnity when it demanded them under a claim of equitable subrogation relating to its surety obligations. Capitol Indemnity contends that Citizens National had sufficient minimum contacts with Missouri to satisfy due process requirements because the bank's vice president sent a facsimile copy of ESI's letter to Missouri and collected payments from the city, on behalf of ESI, which the bank applied to ESI's loan. Capitol Indemnity also alleges that minimum contacts were established because ESI was an agent of Citizens National who made contacts with the city to have the progress payments paid to the bank.

To sufficiently state a cause of action for conversion, the plaintiff must state that "the defendant refused upon demand to return the property at issue and that the plaintiff had a right to possess the property at the time of the alleged conversion." *Auto Alarm Supply Corp. v. Lou Fusz Motor Co.*, 918 S.W.2d 390, 392 (Mo.App.1996). "A petition in an action for conversion sufficiently alleges the owner's interest or right to possession if it states facts from which it can be inferred as a matter of law that the plaintiff had possession or a right to possession at the time the property was converted." *Id.*

Conversion is defined as "the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's

rights." *Lappe and Associates, Inc. v. Palmen*, 811 S.W.2d 468, 471 (Mo.App. 1991). Ordinarily, a cause of action in conversion does not lie "for money represented by a general debt." [5] *Dillard v. Payne*, 615 S.W.2d 53, 55 (Mo. banc 1981). An exception to this rule exists "as to funds placed in the custody of another for a specific purpose and their diversion for other than such specified purpose subjects the holder to liability in conversion." *Id.* "Specific checks, drafts or notes will support a cause of action for conversion where they can be described or identified as a specific chattel." *Dayton Construction, Inc. v. Meinhardt*, 882 S.W.2d 206, 208–09 (Mo.App.1994).

In its pleadings, Capitol Indemnity only identifies the object of its claim of conversion as "certain progress payments" or "the $69,000 in progress payments." It never specifically identifies any checks, their amounts, or when they were paid. Capitol Indemnity does not seek the return of specific checks, but reimbursement in money of a like amount which represented Citizens National's proper application of ESI's accounts receivable payments to ESI's loan under the terms of its loan from the bank. This is not a case where ESI asked the bank to hold the specific city bank drafts for safekeeping, or directed that the specific city bank drafts should be applied only to the labor and materials claims of ESI's subcontractors. *See Lappe*, 811 S.W.2d at 471.

Capitol Indemnity ignores this problem. Instead, it focuses on its contention that it has a right to receive any and all payments the city made on the project dating back to the date of its bond. Capitol Indemnity relies on *First State Bank v. Reorganized School District R–3, Bunker*, 495 S.W.2d 471 (Mo.App.1973). However, Capitol Indemnity misreads *First State Bank*, and its application to the facts of this case is misplaced.

*First State Bank* does say that when a contractor becomes "in default as a matter of fact," and the surety becomes obligated to pay under the terms of its bond, that "the surety's right of subrogation relates back to the date of the execution of the bond." *Id.* at 481. However, this right extends only as to amounts which are unpaid. *Id.* The Missouri Supreme Court has said that an equitable lien may attach to progress payments earned or retained percentages agreed to under the terms of the contract, but only as to sums that are *unpaid* and in the hands of the contractee or placed under the control or joint control of the surety. *National Surety Corporation v. Fisher*, 317 S.W.2d 334, 342 (Mo. banc 1958).

Generally, money paid unconditionally to a contractor for work done under the contract becomes his "to do with as he pleases" and is "freed of any equity or right of subrogation in the surety." *Id.* at

**5.** In *Anderson Electric Car Co. v. Savings Trust Co.*, 212 S.W. 60, 61, 201 Mo.App. 400 (Mo. App.1919), the court held that "money [is] the subject of conversion only when it can be described or identified as a specific chattel," but not "for money had and received for payment of debts." This is because the title to money passes by delivery "and its identity is lost by being changed into other money or its equivalent," and that "mere failure to deliver money in specie on demand would not be technical conversion." *Id.* (citations omitted).

A "debt" is defined as "a specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment." BLACK'S LAW DICTIONARY 363 (5 th

Ed.1979). "It is well-settled that when money is deposited in a bank and is mingled with its general funds it becomes the property of the bank, the transaction creating the relation of debtor and creditor." *Fleischmann v. Mercantile Trust Co. Nat. Ass'n*, 617 S.W.2d 73 (Mo. banc 1981) (quoting *State v. Pate*, 268 Mo. 431, 442, 188 S.W. 139, 142 (1916)). "[C]onversion will not lie where, as here, the money transferred from the checking account by the bank was the property of the bank subject, of course, to [the depositor's] claim as creditor." *Id.* at 74. References to a "general debt," therefore, refer to the bank's obligation to pay out a like sum upon the request of a depositor who has deposited funds into the bank.

345. Capitol Indemnity makes no allegation, nor presents any evidence, that ESI was obligated under its construction contract with the city to use the payments it received from the city only to pay the labor and materials claims on the project.

In this instance, Capitol Indemnity seeks to retroactively recover sums which may or may not have been paid out by the city prior to the alleged default of ESI in paying its labor and materials claims on the project. One of the primary difficulties with Capitol Indemnity's allegation of conversion, is that it fails to state an exact date when it became entitled to any progress payments paid to ESI by the city. Capitol Indemnity alleges generally, that ESI was "in default as a matter of fact" when the bank had difficulty collecting on its business loan to ESI. However, Capitol Indemnity did not become entitled to rights to *earned, but unpaid progress payments*, until it became obligated to and did pay labor and materials claims on the construction project. *First State Bank*, 495 S.W.2d at 480.

Because Capitol Indemnity did not plead or prove by affidavit that it paid labor and materials claims prior to the city's payment of progress payments on January 7, and February 4, 1998, Capitol Indemnity has failed to support its claim of a right of subrogation to the payments.[6] Thus, it cannot be inferred as a matter of law that Capitol Indemnity had a right to possession of the payments at the alleged time of conversion, and its cause of action fails.[7]

Even if Capitol Indemnity had established a cause of action for conversion, it still must prove that Citizens National had "sufficient minimum contacts with Missouri to satisfy due process requirements." *State ex rel. William Ranni Associates*, 742 S.W.2d at 137. In that case, the Missouri Supreme Court succinctly stated those requirements:

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *State ex rel. Deere and Company v. Pinnell*, 454 S.W.2d 889, 893 (Mo. banc 1970). "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of the rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails

---

**6.** Capitol Indemnity contends that it is not required to make a showing on the record of a motion to dismiss that ESI defaulted on its labor and materials claims prior to the dates the progress payments were made, relying on *Magee v. Blue Ridge Professional Building Co., Inc.*, 821 S.W.2d 839 (Mo. banc 1991). However, *Chromalloy*, 955 S.W.2d at 4, governs appellate review of a motion to dismiss for lack of personal jurisdiction.

**7.** Capitol Indemnity also relies on several other cases, but none support its point that it is entitled to recover progress payments already paid without showing that Capitol Indemnity had paid labor and materials claims on the project before the progress payments were made. See *United States Fidelity & Guaranty Company v. Missouri Highway and Transportation Commission*, 783 S.W.2d 516 (Mo.App. 1990) (holding that state commission had no right of setoff against retainage held from progress payments after surety paid to complete highway construction); *Kansas City, Missouri v. Tri–City Construction Company*, 666 F.Supp. 170 (W.D.Mo.1987) (finding that surety became entitled to earned, but unpaid progress payments when contractor sent a letter to the city, who was the contractee, to make all future payments to surety); *International Fidelity Insurance Company v. United States*, 949 F.2d 1042 (8th Cir.1991) (finding that surety's claim of priority to progress payments depends on the date of default); *Home Indemnity Company v. United States*, 313 F.Supp. 212 (W.D.Mo.1970) (holding that under the federal Miller Act, that when a surety pays laborers and materialmen of a defaulting contractor, the surety becomes subrogated to the contractor's rights to money due the contractor but still in the hands of the government contractee).

itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

*State ex rel. William Ranni Associates,* 742 S.W.2d at 137–38. The "purposeful availment" requirement exists to prevent a defendant from being haled into a particular jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or by the "unilateral activity of another party or third person." *Id.* at 138 (quoting *State ex rel. Wichita Falls General Hospital v. Adolf,* 728 S.W.2d 604, 607–08 (Mo.App.1987), quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)).

■ "In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum and the litigation." *Id.* (citing *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984)). The five factors to be considered in this analysis are: "the nature and quality of the contacts with the forum state, . . . the quantity of the contacts with the forum state, . . . the relation of the cause of action to the contacts, . . . the interest of the forum state in providing a forum for its residents, and . . . the convenience to the parties." *Marler v. Hiebert,* 943 S.W.2d 853, 857 (Mo.App. 1997). The first three factors are of greatest importance, while the last two are considered secondarily. *Id.*

Citizens National had only one contact with Missouri. It forwarded a copy of a letter by facsimile machine, to ensure that the letter was received, which was written by its bank customer, ESI, in which ESI requested that the city send any payments due and payable to ESI under the construction contract to the bank's address. Citizens National had no other contact nor did it demand that the city pay over *directly* to the bank any progress payments properly due under the contract to ESI.

Importantly, the city payment drafts were made payable only to ESI. Citizens National obtained benefit from the payments under the terms of a loan document signed by it, a Kansas bank, and ESI, a Kansas corporation, at the bank's office in Kansas. Any control Citizens National exercised over the payments did not occur until after ESI requested that the city send ESI's payments to the bank in Kansas and the payments were deposited pursuant to the Kansas loan agreement.

■ When a nonresident bank performs acts in the usual course of conducting its banking business, without purposefully availing itself of the privilege of conducting activities in Missouri by soliciting business in Missouri, the minimum contacts test is not met merely because the bank returns a check or sends proceeds by mail into Missouri. *State ex rel. Bank of Gering v. Schoenlaub,* 540 S.W.2d 31, 35 (Mo. banc 1976). See also *Stavrides v. Zerjav,* 848 S.W.2d 523, 529 (Mo.App.1993) (holding that an Illinois bank which escrowed a Missouri promissory note in Illinois did not submit itself to personal jurisdiction in Missouri by sending a letter to a borrower in Missouri directing that payment be made to bank in Illinois).

Citizens National did nothing more than what it was authorized to do under the terms of the Kansas loan agreement with ESI. It is difficult to see how Citizens National wrongfully induced the city to make a payment, when Capitol Indemnity did not notify the city until after the progress payments were paid, that Capitol Indemnity was entitled to all future payments. Likewise, nothing in the record suggests that Citizens National was aware that Capitol Indemnity had paid laborers and materials claims as surety for the project prior to Citizens National's receipt of the progress payments.

Capitol Indemnity additionally alleges in this point that Citizens National committed a tortious act outside Missouri, which had

actionable consequences in Missouri. Capitol Indemnity argues that the conversion occurred when Citizens National withheld return of the progress payments upon Capitol Indemnity's demand, and that this act produced actionable consequences in Missouri.

 The commission of an extraterritorial tortious act which produces actionable consequences in this state may support personal jurisdiction in Missouri. *State ex rel. William Ranni Associates,* 742 S.W.2d at 139. The defendant must have set in motion some course of action which was deliberately designed to move into Missouri and injure the plaintiff. *Nelson v. R. Greenspan & Company, Inc.,* 613 F.Supp. 342, 345 (D.C.Mo.1985). To support such jurisdiction, the plaintiff must make a prima facie showing on the validity of his claim of tort. *State ex rel. William Ranni Associates,* 742 S.W.2d at 139. Capitol Indemnity has not made such a showing. None of the cases cited by Capitol Indemnity support its contentions, and therefore, are unpersuasive.

 Capitol Indemnity also alleges in this point that ESI was acting as Citizens National's agent when it directed the city to send payments to ESI in care of the bank's address. Agency is a fiduciary relationship which requires the existence of three elements: that the agent "holds a power to alter legal relation between the principal and third persons and between the principal and himself"; that the agent "is a fiduciary with respect to matters within the scope of his agency"; and that "the principal has the right to control the conduct of the agent with respect to matters entrusted to him." *State ex rel. Bunting v. Koehr,* 865 S.W.2d 351, 353 (Mo. banc 1993). The absence of any one of these elements defeats the claim of agency. *Id.*

 As between a bank and a customer borrowing funds, no confidential or fiduciary relationship exists. *Lemay Bank and Trust Company v. Harper,* 810 S.W.2d 690, 693 (Mo.App.1991). Capitol Indemnity's contention that ESI was an agent of Citizens National when it directed the city to change the mailing address on the payments is insufficient to support its argument that ESI had the power to alter the legal relations between Citizens National and anyone at all.

We find, therefore, that any contact that Citizens National had with Missouri was exactly the kind of random and attenuated contact that is insufficient under the due process analysis to support personal jurisdiction in Missouri. The unilateral activity of ESI in directing the city to change the mailing address of its payments is insufficient to support personal jurisdiction over the Kansas bank. As Capitol Indemnity is headquartered in Wisconsin, we cannot see that either the interest of Missouri in providing a forum for its residents or considerations of convenience to the parties is so strong that "fair play and substantial justice" permit Missouri to assert personal jurisdiction in this case. Because Capitol Indemnity has neither properly stated a cause of action for the tort of conversion nor satisfied due process requirements for the establishment of personal jurisdiction, its first point is denied.

 In its second point, Capitol Indemnity also contends that the long arm statute applies because Citizens National was transacting business in Missouri by virtue of its forwarding, by facsimile machine, a copy of a letter written by ESI to the city in which ESI directed the city to send its payments to ESI in care of Citizens National. It argues that because Citizens National is a national banking corporation, and part of its normal duties include collecting payments, that it was "doing business" in Missouri when it collected the payment from the city to ESI. This, it contends, established sufficient minimum contacts with Missouri to satisfy due process concerns.

 As used in the Missouri long arm statute, the "transaction of any busi-

ness within the state" is a term to be construed broadly. *State ex rel. Metal Service Center of Georgia, Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. banc 1984). The purpose of the statute is "to confer jurisdiction over nonresidents who enter into various kinds of transactions with residents of Missouri." *Id.* "The business may consist of a single transaction, if that is the transaction sued upon." *Id.*

However, use of the mail or telephone communications, without more, does not constitute the transaction of business for purposes of long arm jurisdiction in Missouri. See *Elaine K. v. Augusta Hotel Associates Limited Partnership*, 850 S.W.2d 376, 379 (Mo.App.1993); *State ex rel. Pain, Anesthesia and Critical Care Services, P.A. v. Ryan*, 728 S.W.2d 598, 603–04 (Mo.App.1987); *Marler*, 943 S.W.2d at 857; *State ex rel. Bank of Gering*, 540 S.W.2d at 35; *Farris v. Boyke*, 936 S.W.2d 197, 201–02 (Mo.App.1996).

Capitol Indemnity primarily relies on *Mead v. Conn*, 845 S.W.2d 109 (Mo.App. 1993). However, we distinguish this case on its facts. In *Mead*, this court determined that a Kansas physician's use of telephone lines to transmit medical test results from his office in Kansas to another physician's office in Missouri, *for which he paid the Missouri physician a fee to evaluate the results*, qualified as "transacting business" in Missouri for purposes of the long arm statute. *Id.* at 112. However, this court went on to determine that the nature, quality and quantity of that contact with Missouri were insufficient under the requirements of due process to establish personal jurisdiction. *Id.* at 113.

The facts in this case are analogous to those in *Stavrides v. Zerjav:*

The uncontroverted facts set forth in the ... affidavit establish that [the bank] is an Illinois corporation with its principal place of business in Illinois. It was not authorized to do business in Missouri, it had no office, real estate, or resident agent in Missouri. It was solicited to enter into the Escrow Agreement in Illinois. All negotiations connected with the Agreement took place outside of Missouri and the Agreement was executed in Bloomington, Illinois. [The bank's] obligations under the Agreement were limited to receiving the notes, collecting the payments, and remitting them to the lender. There is no contention that any of these acts took place in Missouri.

It appears from the record that the only act [the bank] took in relation to this note which had any connection with Missouri was mailing a letter to Stavrides in Missouri advising him that he should send his payments to [the bank in Illinois]. This use of the mail does not constitute transacting business in Missouri. *State ex rel. Bank of Gering v. Schoenlaub*, 540 S.W.2d 31, 35 (Mo. banc 1976). Under these circumstances, [the bank's] escrow of a Missouri promissory note in Illinois did not constitute the transaction of business in Missouri for the purposes of long arm jurisdiction.

848 S.W.2d at 529. We find no support for Capitol Indemnity's contention that Citizens National transacted business in Missouri when it forwarded a letter in which its Kansas bank customer requested that the city send its payments to Citizens National's address.[8]

**8.** Capitol Indemnity also relies on *Estes Peterbilt, Inc. v. Nielsen Truck Leasing, Inc.*, 824 S.W.2d 460 (Mo.App.1992), and *State ex rel. Caine v. Richardson*, 600 S.W.2d 82 (Mo.App. 1980). In *Estes*, the Southern District determined that personal jurisdiction was proper over a Chicago, Illinois, bank because it owned and then leased those trucks to a company that operated a trucking terminal in Springfield, Missouri. 824 S.W.2d at 463–64. In *Caine*, the Eastern District found that personal jurisdiction was properly asserted over a Kansas airplane manufacturer because, among other contacts, it had two franchised dealers in Missouri, advertised sales in Missouri and had sold 69 planes in Missouri. 600 S.W.2d at 84. Thus, in these cases, the

Even if we were to assume, *arguendo*, that the sending of the letter amounted to "transacting business," at most, this act can only be construed as an attenuated contact, single in nature, which under due process requirements cannot justify the imposition of personal jurisdiction by Missouri courts over Citizens National. Capitol Indemnity's second point is denied.

We affirm the judgment of the circuit court.

ULRICH and SMART, JJ., concur.

defendant obtained direct financial benefit

from activities in the state of Missouri.